## LEACH & WIFE vs. WEST et als.

1. A bailee of slaves, who recognises the title of the owners, *two of whom are infants,* and, acting in good faith, keeps them subject to delivery whenever legally demanded, but who, in consequence of instructions from the guardian of the infants, refuses to deliver them to the other joint owners, without his authority, is not chargeable in equity with what the slaves would have hired for, but only with the actual value of their services, after deducting the expenses of their food and clothing.

2. Where a father by deed conveys a life estate in slaves to his son, with remainder to his brothers and sisters should he die without children, and the son afterwards exchanges one of the slaves with his father for another, refusing at the same time to receive the slave exchanged for subject to the limitations of the deed, but requiring therefor an absolute deed from his father with covenant of warranty, the slave so exchanged for cannot be considered as substituted for the one embraced in the former deed.

Error to the Chancery Court of Dallas. Before the Hon. W. W. Mason, chancellor.

THE bill, which was filed by defendants against plaintiffs in error, two of whom are infants, to recover certain slaves and to have an account of their hire, &c., alleges that Jonathan Brantly, the father of the complainants, on the 12th Sept. 1834, conveyed by deed to James B. Brantly, another child, certain slaves, for and during the term of his natural life, and at his death, having no child or children then living, to his brothers and sisters, or their descendants: that James B. Brantly took

possession of the slaves under and by virtue of the deed, and subject to its conditions and limitations: that the said James B. is now dead, and at the time of his death was in possession of all the slaves named in the deed, except one by the name of Watt, which the said James B. in his life-time had exchanged with his father for one by the name of Carey, by which exchange Carey was substituted for and put in the stead of Watt, and held subject to the conditions of the deed: that the said James B. left a widow, Elizabeth B., since married to her co-defendant Leach, but no child or children, and that since the death of the said James B., all the slaves embraced by the deed, together with the slave Carey, have been in possession of the said Elizabeth B. and said Leach, who, though the said Elizabeth admitted complainants' right to them, refuse to deliver them to complainants, &c. The two infant defendants are children of a deceased son of Jonathan Brantly. The answer of Mrs. Leach denies that Carey was ever held subject to the conditions of the deed, and avers that he was conveyed by Jonathan to James B. Brantly by a separate and absolute deed with covenant of warranty, and that at the time of the transaction and before its consummation the said James B. positively refused to receive Carey and hold him in any other way than as his absolute property, free from any condition or limitation. It also denies that the defendants have ever refused to deliver up the balance of the slaves on such demand as could be safely complied with, and avers that they have always been ready to deliver them, whenever they could legally do so; that she had been advised by counsel, that as some of the parties entitled to them were minors, it would not be safe to deliver them to any one of them, without such one was legally authorised to receive them: that the regularly appointed guardian of the minors had notified her not to give them up: and that under these circumstances, acting in good faith, and not only willing but anxious to deliver up the slaves, she was compelled to decline their delivery to one of the complainants, who demanded them, but who exhibited no authority from the others to do so. The answer further denies that, under the facts and circumstances, keeping the slaves, as was ever the case, subject to delivery at any time on such demand as could be safely complied with, the defend-

ants are liable for the hire of the slaves. The proofs are suffi-ciently referred to in the opinion of the court.

The chancellor on the final hearing decreed, that the defend-ants deliver up Carey, the others having been previously de-livered to the master under a decretal order, and account for his hire as well as that of the other slaves. The defendants thereupon appealed, and now assign this decree as error.

LAPSLEY, for plaintiffs in error:

There is error in two matters—1st. In charging the defend-ants below with hire. The testimony shows, as the answer avers, that Mrs. Brantly (the widow of James B., now the wife of Leach) was not only willing and ready at all times, but that she was most anxious to deliver up the slaves, when-ever she could do so with safety, and that she kept them most unwillingly: that she acted from first to last in this matter un-der the advice of counsel.

2. There was error in decreeing against the defendant be-low, for the slave Carey. How can it be contended that Ca-rey was subject to the original deed of gift? He was acquired long after, without any reference to the deed, and a separate and absolute title taken for him. The answer denies that he was received subject to the deed in any way; and the terms of the bill of sale taken for him, the money consideration ex-pressed, the absolute warranty of title to the vendee *and his heirs*—these facts show most conclusively, that it was not in-tended by either party that Carey should be held subject to the deed. The fact that Carey was obtained from the donor, and in exchange for a negro originally given by the deed, is of no consequence. James B. Brantly had the right to set what price he pleased on his life estate in Watt: the price he set was an absolute and unconditional title to Carey. If the father was willing to give Carey absolutely, as he did, for the life estate in Watt, why might it not be done? Who had the right to object?

EVANS, for defendants:

1. There are but two assignments of error—one impeach-ing the decree, because hire for the slaves is decreed against the defendant; the other, because the decree adjudges the

slave Carey to be subject to the equitable claim of the complainants and the infant defendants. In respect to the hire, we insist, that even if it were true that the defendant Elizabeth could not safely surrender the slaves at an earlier day, still if the services of the slaves have been beneficial to her, she is bound in equity to account to us to the extent of those services. Whatever the slaves have earned since the institution of the suit, belongs in equity to those who have the title, and it would be manifestly unconscionable to allow the defendant Elizabeth to retain, or deprive the complainants and infant defendants of these earnings. The evidence shows, that the slaves were worked upon the plantation of the defendant Elizabeth from the institution of the suit until given up, (twelve months,) and the defendant has furnished no criterion for the ascertainment of the value of their wages, and consequently we are compelled to resort to the value of the hire as the nearest approximation to the actual benefits which the defendant received from the services of the slaves. It is evident, however, from the whole record, that the defendant Elizabeth B. did not wish to surrender them earlier; she kept them from January to January—just sufficient time to make and gather with them one crop; she then found no difficulty in surrendering them to the register. This might have been done as well earlier—there was nothing to prevent. It does not appear that at any other time, or on any other occasion, she made any effort to surrender the slaves, either to the court or to the parties.

2. Why may she not be required to surrender the slave Carey? It is clear from the evidence, that the transaction was a simple substitution of one slave for the other. It is not denied but Watt would be subject, if in defendant's possession, to our claim; and why may not Carey be equally subject, when he is but placed in the *stead* of Watt? The pretence that the life estate in Watt was sold, and an absolute estate in Carey purchased, is totally unsupported by the proof. Besides, if James B. Brantly sold the slave Watt, so as to place out of reach of complainants, his estate, of which Elizabeth B. is executrix, will be chargeable in equity.

CHILTON, J.—This bill was filed by the defendants in error against the plaintiffs, to recover certain negro slaves and

to have an account for their hire, as also to discover the title deed under which they held said slaves, and to have a partition of the property between the complainants below and two infant defendants, who are incompetent to consent to a division.

There seems to have been no controversy in the court below as to the right of the complainants to recover the slaves, except as to the slave Carey, which the bill charges was substituted by an agreement between Jonathan and James B. Brantly in lieu of Watt, one of the slaves conveyed by the deed; but which allegation is denied in the answer of Mrs. Leach. The answer also denied that Mrs. Leach was liable to pay hire for the slaves. The chancellor decided against the plaintiffs in error upon both grounds.

The assignment of errors presents two questions for our consideration : 1st. Whether the chancellor properly charged the plaintiffs in error with hire for the slaves, while they were in Mrs. Leach's possession. 2d. Whether any decree should have been rendered against them for the boy Carey.

1. Many witnesses were examined as to the value of the slaves, and the willingness of the plaintiffs in error to surrender them. Without setting out the proof, which we have carefully examined, it is sufficient to observe that it very clearly shows, the plaintiffs in error set up no claim to the slaves sued for, except the boy Carey: That Mrs. Leach was willing and even anxious to deliver them to the true owners, upon their executing to her the indemnity which she was advised to demand, against the claim of two minors, who were jointly interested in the property with the complainants, and whose guardian forbade her to surrender them. This indemnity was promised, but never properly tendered. The proof further shows, that she retained the slaves under the advice of counsel, in good faith, and held herself ready at any time to deliver them to the true owners, when she should be justified in doing so. Under such circumstances, we think she should not be held responsible for what the slaves could have been hired for to others. It was uncertain when she would be required to turn them over, either to the court or to the complainants. She could not therefore hire them out for a specified time, lest she should not be able to control them, so as to make the delivery when demanded. Neither could she adjust her farming ope-

rations, so as to render them profitable to her, on account of the uncertainty as to the time she should retain them. But as the proof shows that they rendered her some service, it is proper that she should be charged with the value of whatever service they performed, taking into the estimate the situation in which she was placed in regard to them. The master should have been instructed to inquire and report whether any and what benefit accrued to her from the employment of said slaves, while they were in her possession, and the extent and value of such service, beyond the expense of feeding and clothing them. If any, she should be charged with that sum. Regarding her in the character of bailee or trustee for the owners of the slaves, and having acted in good faith, equity will protect her, and while she shall not make a profit to herself from the employment of the slaves, but for the owners, she must not, on the other hand, be subjected to loss. Greene v. Winter, 1 Johns. C. Rep. 40; McKinley v. Irvine, 13 Ala. 181–705; Hill on Trustees, 534.

2. In respect to the slave. Cary, we have no hesitation in pronouncing the decree erroneous. Waiving the consideration of the question, whether this deed from Jonathan to James B. Brantly did not create a contingent remainder in the complainants, subject to be destroyed by a sale on the part of James B., the person entitled to the life estate, we are very sure, the proof does not sustain the allegations of the bill in respect to the exchange and substitution by the donor and donee of Carey for the boy Watt. So far from this being true, the proof shows that James refused to make the contract, until Jonathan would give him a bill of sale to Carey, vesting in him the entire title. Jonathan, the donor, of course knew the interest which his son had in the slave Watt, as he held under his deed, and that he could purchase no greater interest than his son could sell. This interest he had a perfect right to acquire, and to give in exchange for it the slave now in controversy. The bill of sale which was executed by Jonathan to James B., conveying an absolute title to the latter in Carey, with covenant of warranty, as to title against the grantor, &c., very cleary shows, especially when taken in connection with the other proof, that Carey was to be held as the absolute property of James, and not subject to the limitations

expressed in the deed. It is then too clear to admit of any doubt, that James having an interest in Watt which he could sell, and did sell or exchange for this slave, held him discharged from any claim of complainant's, either vested or contingent. We will not undertake now to decide whether the donor could defeat the remainder by a purchase of a greater interest than the life estate from the donee, as it is not necessary to a decision of this case, and will more properly arise should the remainder men seek to recover the slave from the donor. Upon the proof in this case, it is very clear, the complainants should not have a decree for Carey.

Let the decree be reversed, and the cause remanded for further proceedings conformable to the views above expressed.